[Civ. No. 25821. Second Dist., Div. One. June 6, 1962.]

R. W. BORDERS, Plaintiff and Respondent, v. CLINTON H. ANDERSON, as Chief of Police of Beverly Hills, et al., Defendants and Appellants.

Robert H. Baida, City Attorney, and Martin E. Whelan, Jr., for Defendants and Appellants.

Paul Caruso and Isabelle Trotti for Plaintiff and Respondent.

FOURT, J.—This is an appeal from the judgment whereby the court ". . . ORDERED, ADJUDGED AND DECREED that Petitioner herein, R. W. Borders, is entitled to the issuance of a peremptory writ of mandate requiring the Respondent Civil Service Commission of the City of Beverly Hills to set aside its Findings and Order dated March 24, 1960, and requiring said Commission to reconsider Petitioner's case in the light of the Court's opinion and judgment as expressed in its Memorandum of Decision dated August 22, 1960, and in its Findings of Fact, Conclusions of Law and Judgment herein and requiring Respondent Clinton H. Anderson, Chief of Police of Beverly Hills, to comply with Respondent Commission's new order."

A fair résumé of the facts is as follows:

R. W. Borders (hereinafter referred to as respondent) started as a member of the Beverly Hills Police Department in 1942 as a patrolman. In 1946 he was appointed as sergeant. In 1952 he was appointed a lieutenant, and in 1958 he was appointed a captain. Subsequently he was appointed captain of detectives. He performed his work in an excellent manner and was called by the Chief of Police of Beverly Hills, appellant Clinton H. Anderson (hereinafter referred to as Anderson), the best detective he ever had.

On February 15, 1960, respondent was summarily dismissed by Anderson. At that time respondent was given a letter setting forth the reasons for his dismissal.[1]

[1] "Effective February 15, 1960, you are dismissed from the Beverly Hills Police Department for violations of Section 3 (Conduct Unbecoming to a Police Officer with the Beverly Hills Police Deparrment [sic] and Section 11 (Disobedience to Orders).

"A more specific charge is that on or about January 27, 1960, you contacted Andrew Marudas, a known Police character, contrary to orders issued on previous occasions that you were to refrain from contacting this man or have anything to do with him due to the criticism that this

Subsequently the letter of dismissal and a so-called case history[2] were filed with the Beverly Hills Civil Service Commission (hereinafter referred to as Commission).

association was bringing the Police Department from other Police Departments, the Sheriff's Office, and Federal Agencies. You have failed to heed warnings and you have continued to associate with these underworld characters.

"You were also warned against contacting another known Police character, Bill Miller. In spite of these warnings, you have continued to contact him and the last known times were on January 28, and February 11, 1960.

"An additional charge of disobedience of Section 5—(Neglect of Duty) and Section 11 (Disobedience of Orders) when you removed Robert L. Ramsey (Case No. 81338) on October 6, 1959, from the City Jail, contrary to departmental rules and through your negligence, permitted this subject to escape.

"This is but a few of the incidents that you have violated departmental rules and it is with much reluctance that I must dismiss you, as I have requested your resignation and you have refused to submit your resignation.

" . . . . . . . . . . . ."

[2]"Captain Borders was dismissed from the services of the Police Department on February 15, 1960, after he had refused to resign. The events that lead up to the dismissal are briefly as follows:

"The Captain had developed an extraordinary relationship with a notorious criminal known as Andy Marudas and also another notorious criminal by the name of William Miller, and during the years these relationships have caused considerable unfavorable comment among various law enforcement agencies and law enforcement officers.

" . . . . . . . . . . . .

"The first real serious incident was brought to my attention in August 1957, where Borders interceded in behalf of Marudas who had been involved in either theft or receiving of 52 mens suits which had been stolen in the Hollywood Division. At that time I questioned Borders regarding his intervention in this case and he gave me what at that time appeared to be a reasonable explanation, but he was warned that he should discontinue any association with Mr. Marudas and at no time interfere with other law enforcement agency's arrest of any suspect. The next incident that came to my attention was I heard rumbles that Borders and an insurance investigator named Harold Andersen had been involved with an entrapment case involving Jewel A. Gould in which Marudas was the person who planned the plot at which time Gould was to be killed. This occurred in Las Vegas and when the facts came to light one of the Deputy Sheriffs involved admitted that he had perjured himself and a Deputy was dismissed from the Las Vegas Sheriff's Office (Clark County). Borders was again questioned regarding his association with this matter, but gave an explanation which at the time seemed reasonable as I had not conducted an investigation but was just hearsay. He was again warned. The rumors continued and I felt that for the best interest of the Department that I would transfer Borders from the Detective Bureau to Night Commander of the Patrol Division where he would have very limited investigation activities. This transfer was made on April 16, 1959, and Borders was again advised to discontinue his association with Marudas and other known criminals unless the association was above board, and that these facts could be testified to in open Court. Despite his transfer to the Patrol Division, I was receiving reports that he was meeting these criminals and that on occasions he

The trial court found that both the copy of the letter of discharge and the case history constituted the statement of reasons so required to be filed, and each was a part of the charges

would go away from the Station and meet them in various parts in and out of the city.

"A large number of Police personnel were aware of Marudas' criminal activity and it was common gossip about the association between the Captain and this subject.

"On August 7, 1959, a television broadcaster by the name of Bill Stout conducted a public broadcast where he criticized the association between Marudas, and Captain Borders and Harold Andersen. I again called in Captain Borders and had a conference with him and stated that if these facts were untrue why didn't Harold Andersen, who had unlimited funds from the insurance companies, and he start action against Stout. He said he would take action but after several weeks nothing happened. I again heard rumbles of the association between Borders and these underworld characters and again requested and demanded that these associations be discontinued unless he could prove they were proper in all respects. During this period of time it also came to my attention unofficially that Harold Andersen the insurance investigator, and Borders had been working on losses that were not connected with our Department but in other cities even as far south as San Diego. I again warned him and requested that he dissolve this relationship.

" . . . . . . . . . . .

"In October 1959, two men and a girl held up a jewelry store on South Beverly Drive and Borders came to me and stated that he had some information that might result in the apprehension of the hold-up subjects and I assigned him to investigate this hold-up. The group was arrested in Santa Ana by the Santa Ana Police and Borders and other officers transported the subjects from Santa Ana to our City Jail. While Robert Ramsey, one of the defendants, was confined to our City Jail, Captain Borders removed him from City Jail without permission or using the prescribed precautionary procedures of two or more officers in cases involving a desperate criminal (Ramsey was an ex-convict and narcotic user), and took this subject to Santa Ana where this subject escaped. Much publicity was received and I again reprimanded Borders and warned him that his continued violation of Department Rules would result in disciplinary action. A short time later he was again transferred from the Patrol Division to the Traffic Bureau where he was given specific instructions that his main duties were traffic enforcement, accident investigation, etc., and there would be no particular reason why he would have to contact any members of the criminal world. He assured me that he would discontinue any associations.

. " . . . . . . . . . .

"During the time I interviewed Chief of Detectives Thad Brown of Los Angeles, I obtained startling information about Borders' activities with Marudas and other underworld characters. For the first time actual information was furnished me. I obtained the information that Borders had interceded for Marudas and another person who had been arrested by Pasadena Police. I obtained information about Borders' action of offering an alibi for Marudas who had been arrested for burglary by the West Hollywood Sheriff's Division, and that Borders had interceded in behalf of Marudas to the Probation Department, the District Attorney's Office, and even had made a statement to the trial Judge. His actions had been so unethical and so improper that the Sheriff's Office's relationship with our Department was at a very low ebb. The District Attorney's Office was most unhappy about his action. The Judge was critical. The Los Angeles Police Department was most critical and

before the Commission; that both counsel and the Commission so treated the matter and there is no appeal herein by Borders with respect to this matter.

After a hearing which lasted three days the Commission rendered its findings and order.[3]

---

unhappy about his activities. Prior to this last investigation, as I previously stated, this had been rumors, but now I had obtained the actual facts; in addition to the fact that Borders had blackened the name of two Police Officers with long and fine Police service records. Of Course [sic] this last incident again brought to my attention that Borders was still associating with Marudas and was also associating with Bill Miller and for some reason or another these two individuals would make a contact a day apart brought about suspicion.

''I called Captain Borders into my office on Feb. 11, and reviewed these incidents with him and stated that to me this was a deliberate attempt to break down orders that he should not associate with these criminals; that they were trying to justify his association with them and the thing boomeranged; that the investigation had further proved that he was continuing his association with this undesirable element; that he continued to violate Department Rules despite the fact that he had been officially warned on 3-28-55, 4-10-59, 10-6-59, plus many other times requested to discontinue this association. I requested that he resign as I felt that I in no way wanted to embarrass him. He was off over the weekend so I said I would review the question with him on Monday, Feb. 15. At that time he advised me that he would not resign and his written dismissal orders were furnished him.

''Dismissal of Captain Borders in my opinion was absolutely necessary as it appears that he for some reason or another cannot divorce himself from these associations with the underworld element and I was surprised and totally disgusted when the facts were revealed to me as to his type of person.

''His argument that he expressed to the press that it is essential to have contacts with the underworld is partially true. There is no question in my mind that informants have their value and their place but at no time should a Police Officer be placed in a position where he fraternizes and becomes so attached to the criminal that he has to offer alibis, intercede in his defense or any other matter that cannot be fully explained and above suspicion.

''There have been all sorts or [sic] rumors and complaints made, but I have limited my investigation to violation of Departmental Rules and Regulations.''

[3] ''I

''The Commission finds that the Employee [i.e. Borders] was given timely notice of the allegations of reasons and charges in support of his discharge; he was given timely notice of the date of the hearing on his appeal; and he waived his right to have his appeal heard within the time provided by law.

''II

''The Commission finds that the Employee did violate Section 11 of the Rules and Regulations of the Police Department, Beverly Hills (Exhibit 12), DISOBEDIENCE OF ORDERS, in that:

''A. The Chief of Police did, on many occasions prior to January 1, 1960, warn the Employee not to associate with one Andrew Marudas, an ex-convict, person of ill repute, and informant, and specifically, on or about January 1, 1960, upon the occasion of the Employee being assigned as the traffic Division Commander (a duty not requiring the

Respondent Borders sought a writ of mandate in the superior court. A peremptory writ was issued pursuant to judgment against both the Commission and Anderson.

use of informants), the Chief of Police did order the Employee to refrain from contacting or having anything to do with Andrew Marudas; and

"B. Contrary to said warnings and order, the Employee did have contact with, and did associate with, said Andrew Marudas many times and particularly on January 24, 25, 26, and 29, 1960, and did, on behalf of said Andrew Marudas, contact the Federal Bureau of Investigation on several occasions during said period, all without the prior consent or knowledge of the Chief of Police.

"III

"The Commission finds that the Employee did violate Section 3 of the Rules and Regulations of the Police Department, Beverly Hills (Exhibit 12), CONDUCT UNBECOMING TO A POLICE OFFICER OR EMPLOYEE OF THE POLICE DEPARTMENT, in that:

"A. Having knowledge tending to show the innocence of a person (said Andrew Marudas) accused of having committed a crime, the Employee deliberately failed to come forward and testify at the trial of said person; and

"B. The said actions of the Employee brought disrepute and criticism from other law enforcement agencies upon the Beverly Hills Police Department.

"IV

"The Commission finds that the Employee did violate Section 3 of the Rules and Regulations of the Police Department, Beverly Hills (Exhibit 12), CONDUCT UNBECOMING TO A POLICE OFFICER OR EMPLOYEE OF THE POLICE DEPARTMENT, in that:

"A. In connection with the trial and conviction of said Andrew Marudas on a criminal charge, the Employee interceded on behalf of said Andrew Marudas with the District Attorney, the Probation Department, and the Trial Judge in a deliberately improper and unethical manner, all without the prior consent or knowledge of the Chief of Police; and

"B. The said actions of the Employee brought disrepute and criticism from other law enforcement agencies upon the Beverly Hills Police Department.

"V

"The Commission finds that the Employee did violate Section 3 of the Rules and Regulations of the Police Department, Beverly Hills (Exhibit 12), CONDUCT UNBECOMING TO A POLICE OFFICER OR EMPLOYEE OF THE POLICE DEPARTMENT, in that:

"A. After the conviction of said Andrew Marudas on a criminal charge and in the course of offering an alibi on behalf of said Andrew Marudas, the Employee made a statement to the Trial Judge (Superior Court Judge Herbert V. Walker) that he (the Employee) had been advised by Chief Deputy District Attorney Manley J. Bowler not to testify at the trial of said Andrew Marudas, which statement was deliberately false and untrue, and which statement caused the Judge to be very critical.

"VI

"The Commission finds that the Employee did violate Section 5 of the Rules and Regulations of the Police Department, Beverly Hills (Exhibit 12), NEGLECT OF DUTY, in that:

The essence of the trial court's determination is as follows:

First, that the respondent Commission's finding II (i.e., disobedience of respondent Anderson's order relating to associating with Marudas) was partially sustained by the evidence.

The trial court's memorandum of decision, which is referred to in the judgment, incorporated by reference in the trial court's findings of fact and incorporated by reference in the trial court's conclusions of law, provides in pertinent part that:

"From the evidence this finding must be sustained in part, but cannot be sustained in part.

". . . . . . . . . . .

". . . the record does support an order from Chief Anderson to petitioner not to contact Marudas and to stay away from him. This was about January 1, 1960. . . .

"Thereafter, there is evidence . . . that petitioner did con-

---

"A. On or about October 6, 1959, the Employee did negligently allow one Robert L. Ramsey, a prisoner, to escape from his custody.

"VII

"The Commission finds that any one of the foregoing findings (II through VI), in and of itself, would constitute sufficient cause to support the action of the Chief of Police, in discharging the Employee.

"VIII

"The Commission finds that any one of the foregoing findings (II through VI), in and of itself, would cause the Commission to make its Order as hereinafter set forth.

"IX

"In view of the extensive publicity given to certain portions of the testimony in this matter, the Commission feels that it is its duty, in fairness to the Employee, to make the following negative findings:

"A. There is no evidence from which it can be shown or inferred that the Employee at anytime was involved in any way in any plot or plan to have any person killed.

"B. There is no evidence from which it can be shown or inferred that the Employee at anytime was involved in any way in any plot or plan to commit a burglary.

"C. There is no evidence from which it can be shown or inferred that the Employee at anytime received or was given any improper reward, money, or other thing of value in connection with his activities as a police officer, or otherwise.

"ORDER

"In coming to its decision in this matter, the Commission has given great weight to the admitted excellent past record of the Employee as a detective, and to his possible continued value to the City of Beverly Hills as a police officer, and for these reasons, the Commission does hereby modify the Order of Discharge in this matter as follows:

"Effective as of February 15, 1960, W. H. Borders [sic] is reinstated as a member of the Police Department of the City of Beverly Hills. He is demoted to the rank of Police Officer without prejudice to future promotions, and he shall be compensated for time lost from February 15, 1960, at the rate of pay of a Police Officer."

tact Marudas and that he did contact the F.B.I. in connection with some police matter involving Marudas.

"This Court, therefore, must accept the finding of the Commission as to some of these contacts made after January 1, 1960. . . . I am of the opinion that when the Chief gave orders not to contact Marudas and to stay away from him, that the Chief was clearly acting within the scope of his authority and that petitioner was bound thereby regardless of any reasoning on his part.

". . . this finding in that respect and to that extent must be sustained."

Second, that the respondent Commission's finding III (i.e., failure to come forward and testify at Marudas' trial while having knowledge tending to show the innocence of said person); finding IV (i.e., Borders' intercession on behalf of Marudas with the district attorney, probation department, and the trial judge in an improper and unethical manner without prior consent or knowledge of appellant Chief Anderson); and finding V (i.e., Borders' false statement to Judge Walker after the conviction of Marudas that Chief Deputy District Attorney Manley J. Bowler had told Borders not to testify at the trial of Marudas), were:

1. Not contained as charges within the statement of reasons (i.e., letter of discharge and case history) and therefore not within the scope of the hearing; and

2. Not supported by substantial evidence.

Third, that Borders was not accorded a fair hearing because:

1. The Commission made findings on charges not contained in the statement of reasons;

2. One of the commissioners seemed biased; and

3. The punishment imposed was too severe.

■■■ The Commission is a local administrative tribunal exercising quasi-judicial functions. ■■■ What is stated in *Takata* v. *City of Los Angeles*, 184 Cal.App.2d 154, 159 [7 Cal.Rptr. 516] is pertinent to the scope of review by the trial court:

" [1] In reviewing the findings and orders of a local, quasi-judicial administrative body, the *trial court* is confined to the evidence received by the respondent Board; and in reviewing that evidence may not reweigh it, but may only consider whether there is any substantial competent and material evidence in the administrative record to sustain the findings and order attacked. (*Thompson* v. *City of Long Beach*, 41 Cal.2d 235 [259 P.2d 649]; *Damiani* v. *Albert*, 48 Cal.2d 15

[306 P.2d 780] ; *Jenner* v. *City Council of the City of Covina,* 164 Cal.App.2d 490 [331 P.2d 176] ; *Sultan Turkish Bath, Inc.* v. *Board of Police Commissioners,* 169 Cal.App.2d 188 [337 P.2d 203] ; *Rudolph* v. *State Athletic Commission,* 177 Cal. App.2d 1 [1 Cal.Rptr. 898].)

" . . . . . . . . . . .

" [3] The term 'substantial evidence in light of the whole record', is equivalent to the 'substantial evidence rule.' (*Martin* v. *Alcoholic Beverage Control Appeals Board,* 52 Cal.2d 238, 246 [340 P.2d 1] ; *Marini* v. *Department of Alcoholic Beverage Control,* 177 Cal.App.2d 785 [2 Cal.Rptr. 714].) " (See *Greenblatt* v. *Martin,* 189 Cal.App.2d 787, 789 [11 Cal.Rptr. 669].)

It is appropriately stated by Mr. Justice White in *Schneider* v. *Civil Service Com.,* 137 Cal.App.2d 277, 284 [290 P.2d 306] that :

" [4] The Civil Service Commission of Los Angeles County is a local administrative tribunal exercising quasi judicial powers and its actions may be reviewed by mandamus. [5] However, on such a review the chief issues are whether the person affected has been accorded a fair hearing, and if so, whether there is any substantial evidence to support the determination of the administrative board. In the review proceedings the court must confine itself to the showing made before the administrative tribunal with regard to the sufficiency of the evidence. [6] The power to make the determination of whether or not there is a basis for the discharge in the instant case is vested in respondent commission. In the absence of a claim that the commission proceeded without or in excess of jurisdiction, or that the trial was not full or fair, or that there was a prejudicial abuse of discretion in some other respects, the courts are confined to the question of determining whether the decision of the commission is supported by the findings and the findings are supported by substantial evidence in the light of the entire record. [Citations.] "

█ The function of the appellate court with respect to the sufficiency of the evidence is to ascertain whether the findings of the Commission and trial court are supported by substantial evidence. (See *Greenblatt* v. *Martin,* 189 Cal. App.2d 787, 789, 790 [11 Cal.Rptr. 669] ; *Barr* v. *City of San Diego,* 182 Cal.App.2d 776, 780 [6 Cal.Rptr. 510] ; *Fromberg* v. *Department of Alcoholic Beverage Control,* 169 Cal.App.2d 230, 232 [337 P.2d 123].) Where the trial court determines

that the Commission's findings are *not* supported by substantial evidence, the appellate court examines the record to ascertain whether there is substantial evidence to support the Commission's order and decision. (See *Greenblatt* v. *Martin, supra.*)

Appellants' first contention is that each of the Commission's findings was sustained by substantial evidence and that the matters embraced thereby were properly before the Commission.

The appellants have extensively digested the evidence in an attempt to demonstrate that each of the Commission's findings (i.e., findings II through VI) is supported by substantial evidence. However, the Commission's findings of fact VIII, that "any of the foregoing findings (II through VI), in and of itself, would cause the Commission to make its Order as hereinafter set forth" obviates the necessity of determining whether all the findings are supported by substantial evidence. (See *Black* v. *State Personnel Board,* 136 Cal.App.2d 904, 912 [289 P.2d 863]; *Fuller* v. *Board of Medical Examiners,* 14 Cal.App.2d 734, 736 [59 P.2d 171].) In the *Black* case it is stated at page 912 in pertinent part as follows:

"The trial judge, observing that the board had specifically found in paragraph X . . . that each of the causes for punitive action set forth in Paragraphs IV, V and VI, 'separately and severally, so found to be true is sufficient to support the punitive action taken,' concluded that it was unnecessary to determine whether substantial evidence existed in support of finding IV. There was no error in this, for having found that paragraphs V and VI of the findings are supported by substantial evidence, paragraph IV could be of consequence only with respect to the penalty imposed, *and the board having declared each offense covered by V and VI to be sufficient ground for dismissal, it had left no opening for the trial judge to inquire into that matter. . . . the determination of the penalty to be imposed by an administrative agency lies with the agency and not with the court.* [Citations.]" (Emphasis added.)

Commission finding of fact II, which is discussed in part above, is, contrary to the trial court's determination, supported *in toto* by substantial evidence.

 Finding II provides in part that:

"A. The Chief of Police did, on many occasions prior to January 1, 1960, *warn* the Employee not to associate with . . . Marudas . . . and specifically, on or about January 1, 1960 . . .

the Chief of Police did *order* the Employee to refrain from contacting or having anything to do with Andrew Marudas. . . .

"B. Contrary to said *warnings* and *order,* the Employee did have contact with, and did associate with, said Andrew Marudas many times and particularly on January 24, 25, 26, and 29, 1960. . . ." (Emphasis added.)

The learned trial judge in his memorandum of opinion, in discussing finding II, misconstrued the plain language of that finding and substitutes for the word "warn" the word "orders," and then concludes that ". . . the record could not sustain a finding that petitioner was *ordered* by the Chief to refrain from any further activity with Marudas as an informant *prior* to that date [i.e., January 1960]." (Emphasis added.)

The record clearly supports the finding of fact as actually found by the Commission. As stated by the trial judge in his memorandum, "The best that could be said of these conversations [i.e. prior to January 1960] as related by Chief Anderson is that they were merely cautionary *warnings* to petitioner." (Emphasis added.)

The trial court did find, and there is substantial evidence in support thereof, that respondent Borders did violate the order of January 1, 1960.

Commission finding of fact V, set forth above, provides in pertinent part that:

"A. After the conviction of . . . Marudas on a criminal charge and in the course of offering an alibi on behalf of said . . . Marudas, the Employee made a statement to the Trial Judge (Superior Court Judge Herbert V. Walker) that he (the Employee) had been advised by Chief Deputy District Attorney Manley J. Bowler not to testify at the trial of said Andrew Marudas, which statement was deliberately false and untrue, and which statement caused the Judge to be very critical."

Judge Walker testified before the Commission and the reporter's transcript of that proceeding discloses the following in part:

"Q. What is your occupation, sir? A. Judge of the Superior Court.

"Q. Los Angeles? A. That is right.

" . . . . . . . . . . .

"Q. Directing your attention to the case of *People* versus *Gould and Marudas,* Case No. 207,108, in the Superior Court of Los Angeles County, which you tried in February of 1959,

would you tell the Commission whether you had any conversation with Captain Borders at any time in connection with this case? A. Yes.

"Q. Do you recall when that occurred? A. Well, as nearly as I can fix the date, it was sometime after March 25th and sometime prior to April 14th. It was in between those two dates.

"Q. 1959, Judge? A. 1959. On March 25th I had set what Marudas and his attorneys thought was exorbitant bail on appeal. There was considerable effort made for me to reduce that bail, and there was a motion made by the attorneys for the reduction of bail. During the period I just related, sometime between March 25th and April 14th, Captain Borders came to my chambers and he stated that—I can't give you the exact words, gentlemen—words to this effect, that he would like to assist him in getting that bail reduced, and there were—he felt that the man was innocent, that he had evidence that the man had an alibi, that he was baby sitting at home during the time of the alleged occurrence.

"So I said to the Captain that I was aware of that fact, that it was contained in a probation report which I had reviewed and a similar statement he had given to the probation officer, *but it was a little hard for me to understand why, if that was a fact, he hadn't taken the stand in the trial and so testified,* that I had been informed that he was in the courtroom during most of the trial.

"*He stated to me that that had given him considerable question but he had discussed it with the law enforcement official, and the law enforcement official had advised him not to do it. In that instance I asked him who it was and he told me it was Mr. Bowler, Manley Bowler, Chief Deputy District Attorney.*

"COMMISSIONER DAVIS: Who?

"THE WITNESS: Mr. Manley Bowler, the Chief Deputy District Attorney. That was the substance of the conversation. There may have been other things said; I don't know.

"MR. MICHALSKI: Q. Did you call Mr. Bowler and determine whether or not he had advised Captain Borders to testify or not to testify?

"A. Later that afternoon—of course, having known Manny for a great number of years, it was a little—well, I can't say what I think. I did call Mr. Bowler on the telephone and related this conversation. And he told me this. He said, 'Well, the Captain did come in and related this information to me and asked me whether he should testify,' and he said, 'I

advised him to——' He would have to use his own judgment, but if he did not testify, that if the Captain did not elect to testify, if he would bring the information back to him after the trial, that he would have it checked out, and if it proved to be true he would incorporate it or bring it to the court's attention at trial of the motion for a new trial, and the Captain never returned to his office with that information.''

On cross examination the record discloses the following in part:

''Q. Judge Walker, you have been in the District Attorney's office and you have been a Superior Court judge for seven years. Would you say that law enforcement officers have a duty to protect the innocent as well as prosecute the guilty? A. Every person in the world has that duty.

''Q. So if Captain Borders in his mind believed this man to be innocent, would you say that he had a duty to come forward and make that fact known? A. I certainly do. I think he should have made it known at the trial, if that is what you want to know.

''Q. That is not what I want to know. I want to know if in your opinion—— A. In my opinion no one should ever conceal evidence, either the guilt or the innocence of the man, and the proper place to bring it out is in the courtroom, where it can be weighed.

'' . . . . . . . . . . .

''Q. So I will ask the last question: There is a duty on the part of any law enforcement officer to protect the innocent as well as—— A. I will answer that. It is the duty of any officer or citizen to produce any evidence in court, at the trial, either for or against the person accused of a crime.

''Q. And the proper way to do that, sir, is to discuss it with the authorities who are trying the case, is that correct? A. The proper way to do it is to bring it in where it belongs; that is in the courtroom.''

The judge's testimony on redirect is in part as follows:

''Q. In your opinion, Captain Borders was concealing evidence in this case, was he not? A. Well, I guess the answer to that question would be yes.''

Mr. Manley Bowler, Chief Deputy District Attorney of Los Angeles testified in part as follows:

''Q. . . . . . . . . . .

''Now I ask you this question: Did you or did you not advise Captain Borders not to testify? A. I have already stated that I certainly did not tell him not to testify.''

It is clear that there was substantial evidence to support Commission finding V.

By virtue of the Commission finding VIII, that ". . . any one of the foregoing findings (II through VI), in and of itself, would cause the Commission to make its Order . . .," the necessity of further extending this opinion by determining whether there is substantial evidence to support the other findings is eliminated. (See *Black* v. *State Personnel Board,* 136 Cal.App.2d 904, 912 [289 P.2d 863]; *Fuller* v. *Board of Medical Examiners,* 14 Cal.App.2d 734, 736 [59 P.2d 171].)

Appellants' next contention is that the findings were supported by charges (i.e., statement of reasons), and in any event Borders, through his attorney, treated the items embraced within the findings as within the scope of the hearing and waived any such objection.

Set forth within the letter of dismissal which the trial court found to constitute, along with the case history, the statement of reasons required to be filed is the following:

"A more specific charge is that on or about January 27, 1960, you contacted Andrew Marudas, a known Police character, contrary to orders issued on previous occasions that you were to refrain from contacting this man or have anything to do with him . . . You have failed to heed warnings and you have continued to associate with these underworld characters."

It is clear that the Commission's finding of fact II is predicated upon this charge and appellants' contention must be sustained.

Set forth within the case history is the following in pertinent part:

". . . Borders had interceded in behalf of Marudas to the Probation Department, the District Attorney's Office, *and even had made a statement to the trial Judge.*"

The charge contained in the case history, that Borders ". . . even had made a statement to the trial Judge" apparently served as the basis for the Commission's finding V.

It is obvious that the charge is not a model of specificity. The trial judge stated in his memorandum:

"It will be noted that in the Case History the only reference to the trial judge is that petitioner 'even had made a statement to the trial judge.' Even if it could be said that this is a specific charge or accusation against petitioner, it

falls short of supporting the finding or forming the basis of any misconduct in making a statement to the trial judge. Petitioner, by this vague, indefinite, narrative statement in the Case History, was not accused of making a deliberately false and untrue statement to the trial judge the nature of which is in the finding [i.e., Finding V], and there is certainly no reasonable basis for holding that petitioner was charged with the conduct which is the subject of this finding. However, even if it could be said that he was, I am of the opinion that this finding also is not supported by substantial evidence in the light of the entire record.''

Whether or not it can be stated that the charge contained in the case history is sufficient to support finding V, it is clear from an examination of the proceedings that the parties treated it as an issue. There was no objection to the introduction of the evidence. On the contrary, in relation to one of the other charges, the following took place:

''MR. CARUSO: I move that this be stricken as not being contained within the case history involved here, nor is it contained in the letter of dismissal. I believe it is outside the purview of the hearing.

''MR. MICHALSKI: If the Commission please, I don't think Chief Anderson's testimony has to be confined exactly to the case history which was presented to the Civil Service Commission or which was transmitted to Captain Borders. I think this is merely amplification of the charges. Any testimony which he gives here now is in addition to that.

''MR. CARUSO: *If we have the same privilege to bring in material which we believe relevant, we have no objection.*''

Matters treated by the parties as being in issue will be regarded as properly in issue even if not raised by the pleadings. (*Gray* v. *Janss Investment Co.,* 186 Cal. 634, 641 [200 P. 401]; *Priebe* v. *Sinclair,* 90 Cal.App.2d 79, 87 [202 P.2d 577]; 3 Witkin, Cal. Procedure (1954) Appeal, p. 2264.)

In any event, Commission finding II is supported by substantial evidence, is contained within the charges, and by virtue of finding VIII would itself constitute sufficient justification for the Commission's order.

Appellants' next contention is that Borders was accorded a fair hearing.

As previously set forth, the trial court determined that respondent Borders was not accorded a fair trial for three reasons:

1. *The Commission made findings on charges not contained in the statement of reasons.*

In light of our prior discussion this determination by the trial court cannot be sustained. The charge which served as the basis for Commission finding II was clearly contained in the statement of reasons. Whether or not Commission finding V was contained in the statement of reasons, it was clearly an issue and treated as such during the hearing. There was substantial evidence in support of both findings.

2. *One of the commissioners seemed biased.*

 The trial judge in his memorandum of opinion, in discussing the claim of unfair hearing, states in pertinent part:

". . . there is the fact that one of the *Commissioners* seems to have expressed a hostile attitude toward petitioner, and by his attitude indicated in his questioning and statements at times during the hearing that he seemed to have taken the role of advocate, as well as judge. It is extremely important that a hearing involving human rights not only be conducted in a completely fair and impartial manner, but that it appears to be so conducted." (Emphasis added.)

Apparently the trial court's reference is to Commissioner Davis, *one of the three commissioners.* The determination by the Commission was by *unanimous* vote. The trial judge did not determine that the Commission was biased.

What was stated in *Thompson* v. *City of Long Beach*, 41 Cal.2d 235, 243 [259 P.2d 649] is pertinent: "The board consisted of five members, with four voting unanimously to sustain the dismissal charges and the other 'having no familiarity with the proceedings, did not participate.' *Even were it to be conceded that the chairman should not have acted on the hearing of this matter, nevertheless a majority of the board, consisting of three participating members in addition to the chairman, unanimously approved the dismissal charges.* Moreover, if it is appellant's position that the rejected evidence in the trial court would show the existence of prejudice on the part of some member of the board in the disposition of her case, the record fails to show that she made appropriate objection at the board hearing. (See *Nider* v. *Homan, supra,* 32 Cal.App.2d 11, 13 [89 P.2d 136].)" (Emphasis added.)

Even assuming that Commissioner Davis took a too active participation in asking questions and that this evidenced a feeling of hostility on his part, the fact remains that the trial

court did not determine that the Commission, or a majority thereof, was hostile.

3. *The punishment imposed was too severe.*

 It is clear that the determination of the penalty to be imposed by an administrative agency lies with the agency and not with the court. (*Eashman* v. *City & County of San Francisco,* 179 Cal.App.2d 782, 787 [4 Cal.Rptr. 264]; *Black* v. *State Personnel Board,* 136 Cal.App.2d 904, 912 [289 P.2d 863]; *King* v. *Board of Medical Examiners,* 65 Cal.App.2d 644, 652 [151 P.2d 282]; *Fuller* v. *Board of Medical Examiners,* 14 Cal.App.2d 734, 737 [59 P.2d 171].)

In the *Eashman* case, *supra,* it was held proper for the trial court to take into account the fact that dismissal appeared to be a harsh punishment for the offense actually proved. However, the case does not equate harsh punishment with an unfair hearing. On the contrary, the court indicated that the harsh punishment "was a proper matter to be considered, with other evidence, to determine whether the hearing officer and *the commission* were biased and had prejudged the case. . . ." (Emphasis added.) In the case at bar the trial judge did not find that *the Commission* was biased.

In a matter of this type and under the circumstances as here presented, it is not the office of the trial court nor of this court to superimpose its concept of what constitutes an appropriate punishment. That determination lies within the exclusive province of the Commission.

For the reasons stated the judgment of the trial court is reversed.

Wood, P. J., and Lillie, J., concurred.